498 P.2d 515

STATE of Arizona, Appellee,

v.

Rudolph Brito BALTIER, Appellant.

Nos. 2 CA–CR 278, 2 CA–CR 281–2.

Court of Appeals of Arizona, Division 2.

June 28, 1972.

Review Denied Dec. 12, 1972.

5. The predecessor statutory counterpart of A.R.S. § 11–532.

Gary K. Nelson, Atty. Gen., by John S.. O'Dowd, Asst. Atty. Gen., Tucson, for appellee.

Edward P. Bolding, Pima County Public Defender, by Albert G. Freeman, Jr., Deputy Public Defender, Tucson, for appellant.

HOWARD, Judge.

Defendant, Rudolph Brito Baltier, was convicted of unlawful possession of dangerous drugs (LSD) in Pima County Cause No. A–18872 and unlawful possession of marijuana in Pima County Cause No. A–18694 and was sentenced to not less than one (1) nor more than three (3) years in the Arizona State Prison on each conviction; these sentences to run concurrently. The only question before this court on appeal is whether the trial court properly denied defendant's pretrial motion to suppress.

On October 15, 1970, at approximately 10:00 a. m., the defendant was observed by Officers Bright and Crum of the Tucson Police Department at Himmel Park in Tucson. The officers, who were traveling through the park in a marked patrol car, saw the defendant get out of a blue Chevrolet and begin walking through the park. He then suddenly turned, ran back to the car, and entered on the passenger side whereupon the car hurriedly left the park. Because it appeared to the officers that the defendant had turned and run upon sighting their patrol car they tried to follow the blue Chevrolet but were unable to locate it after it left the park. At approximately 2:00 p. m. that afternoon, Officers Bright and Crum, still in their patrol car, again observed the defendant in Himmel Park sitting on the side of a small hill with four other individuals. With the idea of questioning the defendant as to why he had run from them earlier in the day the officers drove in the defendant's direction whereupon he got up and started hurriedly walking away as if to leave the park. The officers then pulled alongside the defendant and asked him to "wait a minute" but the defendant ignored the request and continued walking. At that point the officers commanded him to stop and they both alighted from their vehicle and approached the defendant for the purpose of conducting a field interrogation. At this time defendant's fatigue jacket, which he had been wearing in the morn-

ing, was draped over his left shoulder in a manner which concealed his left arm.

Upon being asked for identification by Officer Crum the defendant replied, "Leave me alone, I haven't done anything wrong." The officers again asked for identification at which time the defendant became abusive and belligerent in his language even though the officers were able to get his name and date of birth. The officers then asked the defendant to remove his left arm from under his jacket so that they could be sure that he didn't have a weapon and upon his refusal to do so Officer Crum reached for the jacket but the defendant stepped backward so that the officer's initial attempt fell short. Both officers then grabbed the jacket whereupon a fight ensued which culminated in the arrest of defendant for assaulting a police officer. Following the arrest the jacket was searched and found to contain a bottle of pills which proved to contain LSD. A search of defendant's person resulted in a finding of marijuana.

At the hearing on the motion to suppress the introduction into evidence of the LSD and marijuana both Officers Crum and Bright testified that they had asked defendant to either remove the jacket or let them see his hand because they feared he might have had a gun. They further testified that this belief was based upon the fact that an undercover police officer had been shot in Himmel Park two or three days before this incident and also defendant's belligerent attitude towards the officers upon being interrogated.

Defendant maintains that the facts of the instant case, even when viewed in a light most favorable to the State's position, do not satisfy the test set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which must be met before a police officer may conduct a "frisk." Thus, defendant contends that he had every right to resist the officers' attempt to seize his jacket and that the arrest and subsequent search were therefore both illegal.

The State, on the other hand, contends that defendant's suspicious activities war-

**444**

ranted a field interrogation and that defendant's belligerent attitude coupled with the previous shooting of an officer in the park supported the officers' conclusion that defendant might have been carrying a weapon under the jacket. Thus, the State contends that once the defendant refused to remove his hand from under the jacket the officers had a right to do whatever was necessary to determine whether defendant was in fact armed.

The Fourth Amendment to the United States Constitution provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Here, as in *Terry*, defendant was entitled to the protection of the Fourth Amendment as he walked through Himmel Park in Tucson. The question is whether in light of all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure.

The Court in *Terry* set forth the following test which must be met before the fruits of a search resulting from a "stop and frisk" may be admitted as evidence against the person from whom they were taken:

> "Each case of this sort will, of course, have to be decided on its own facts. We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30, 88 S.Ct. at 1885.[1]

However, as in *Terry*, it must first be established at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when Officers Bright and Crum "seized" the defendant and whether and when they conducted a "search" of his person. As was stated by the Court in *Terry*, "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. at 16, 88 S.Ct. at 1877. The officers here involved testified at the hearing on the motion to suppress that defendant was not required to stop for them, was not required to answer their questions and was not being held against his will until such time as they actually grabbed his jacket and the fight ensued. We find this contention to be wholly without merit. When two uniformed police officers in a marked patrol car pull alongside an individual walking on a sidewalk and upon their request for that person to "wait a minute" having been ignored, order him to stop, alight from their car and confront him on the sidewalk, that person has been "seized." And no citizen, when confronted with such circumstances, would logically believe that he was "free to go on his way."

There can be no question that Officers Bright and Crum "seized" the defendant when they ordered him to stop and initiated their interrogation and, upon his failure to cooperate, subjected him to a "search" when the officers grabbed the fatigue jacket from his shoulder to see if he was armed. Thus, in determining whether the seizure and search were "unreasonable" our inquiry is a dual one—

1. The Supreme Court, in Adams v. Williams, 405 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), recently held that information received by an officer from an informant may also justify an investigative stop and frisk, even though the officer himself has not personally observed any suspicious activity.

firstly, whether the officers' act of "seizing" the defendant for interrogation was justifiable, and secondly, if so, whether the officers were justified in conducting a "search" by forcing the removal of defendant's jacket. It must be noted that the primary question here, the propriety of the "seizure" of defendant's person, was not addressed by the Court in *Terry*.[2]

We will first consider the facts leading to the "seizure" of defendant. From Officer Crum's testimony at the hearing the officers first observed defendant between 9:00 and 10:00 a. m. on the morning of October 15 at Himmel Park in the following manner:

"Q What was it that drew your attention to Mr. Baltier at the early morning time you first saw him?

A I don't know of any special reason that I happened to see him.

Q And how was he dressed at that hour?

A He had a green fatigue army jacket and a green fatigue shirt. I don't remember what pants he had on.

Q What was he doing?

A He was getting out of the car in the north parking lot.

Q Do you know the color of the car or anything about it?

A It was a blue '65 or '66 Chevy.

Q And did you observe how many people were in the car other than Mr. Baltier?

A Several. I don't remember how many.

Q What was it that Mr. Baltier did after he got out of the car?

A Started walking southward into the park.

Q And where were you relative to Mr. Baltier when he began walking southward?

A Almost directly south in the park. We was driving on the grass, driving down the center of the park.

Q Would it be fair to say that you were—or did it come into the line of vision of Mr. Baltier?

A Yes.

Q At this point in time what occurred? In other words, when you came within the line of vision of Mr. Baltier?

A Well, he appeared to see us and he turned around and ran back to the blue car that he had gotten out of, and the car started up and exited—excuse me—to the north side of the parking lot."

Officer Bright testified that upon this occasion his attention had been drawn to the defendant by Officer Crum as defendant entered the blue Chevrolet and he noticed that there were two or three others in the car. The officers attempted to follow the car but because they were forced to exit the park via a different route they were unable to locate the car again.

Officer Bright further testified that at about 2:00 p. m. on the same day, while the officers were again driving through Himmel Park, the following occurred:

"Q All right. When you observed or came in contact with Mr. Baltier about two o'clock in the afternoon, where was it you first observed him?

2. Footnote 16 of *Terry* provides:
"We thus decide nothing today concerning the constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or interrogation. Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred. We cannot tell with any certainty upon this record whether any such 'seizure' took place here prior to Officer McFadden's initiation of physical contact for purposes of searching Terry for weapons, and we thus may assume that up to that point no intrusion upon constitutionally protected rights had occurred." 392 U.S. at 19, 88 S.Ct. at 1879.

A   He was sitting on the grass on the east portion of the hill in Himmel Park with another group of persons.

Q   And how was he dressed at that time?

A   He had a army fatigue shirt on, blue bellbottom pants, and tennis shoes, as I recall, and O.D. army field's jacket in his possession.

Q   And after you first observed Mr. Baltier sitting there with a number of other people, what happened; what did he do?

A   He stood up and began walking away quite rapidly as our vehicle approached.

Q   What—which direction?

A   He started walking to the north toward the north parking lot.

Q   What did you and Officer Bright (sic) do?

A   Officer Crum and myself?

Q   Crum.   Excuse me.

A   Pulled up to the—where Mr. Baltier was walking and asked him to stop and show us some identification.

Q   When you asked Mr. Baltier to stop and show some identification, where were you relative to your police unit?

A   I was speaking from the window.

Q   Who was driving?

A   He was driving.

Q   Now, did Mr. Baltier respond to your request to show identification?

A   I—the first time we asked him to stop he kept walking.

Q   (By Mr. Druke)   He continued to walk and—

A   We yelled at him to stop again.

Q   By, 'we' do you mean in fact both of you yelled?

A   Yes.

Q   All right.   And how did Mr. Baltier respond to the yelling?

A   He stopped.

Q   Were you at the time of the yelling still in your vehicle?

A   I was in the process of exiting myself at the second time.   The first time I was in the vehicle."

Once the officers had stopped defendant they immediately asked him for some identification, to which he replied, "I didn't do anything, leave me alone, quit hassling me."   The officers continued to question the defendant and although he did give them his name and date of birth, he became increasingly belligerent and abusive in his language while continually repeating that he just wanted to be left alone.   The officers testified that the only reason they had stopped him was to conduct a field interrogation and to ask why he had run from them earlier in the day.   They did not suspect him of having committed or of being in the process of committing any crime.   At the preliminary hearing on the charge for illegal possession of LSD, Officer Bright, upon cross-examination, gave the following testimony:

"Q   Did you approach the defendant to arrest him at that time?

A   No, we did not.

Q   Well, assuming that he had just stood there and said, 'I don't care to join in a field interrogation,' what would you have done at that point?

A   There was nothing we could have done.

Q   Isn't this what he did?

A   No.   He told us his name and his date of birth.

Q   Didn't he just say, 'I don't want to talk to you.   Quit hasseling me,' or, 'Leave me alone,' or words to that effect?

A   Words to that effect.

Q   You persisted nonetheless and got his name?

A   He was cooperative.   He was saying that, but he still was cooperating.

Q   It was pretty apparent, was it not, that he just didn't want to talk to you?

A   It was apparent that he didn't care to talk to any police officer, yes.

Q Okay, But when you walked up to him there was no reason to arrest him in your own mind. Is that right?

A Not at that time, no.

Q And it wasn't until you snatched at the coat that he had on his shoulder that anything bad happened, anything physical, at least?

A That's correct."

We think it is clear from the above and from the entire transcripts of hearings in this case that defendant was not only "seized" but that he was questioned against his will and that he had, in every way short of fleeing, let the officers know that he did not wish to cooperate in a field investigation. It remains then for us to ascertain what, if any, test must be met before an officer can make a forcible stop and retain an individual once it is apparent that the person does not wish to cooperate and further to determine whether the facts before us meet such a test.

■ As has been previously pointed out, the Fourth Amendment provides that "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . ." The Supreme Court recognized in Union Pac. Ry. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), and reiterated in *Terry*, that:

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 392 U.S. at 9, 88 S.Ct. 1868, 1873.

The Court went on to say in *Terry* that wherever an individual may harbor a reasonable expectation of privacy, he is entitled to be free from unreasonable governmental intrusion. We believe that this freedom from intrusion applies to a person's right to be free from an unlawful interrogation as well as an unlawful search.

Justice Harlan, in his concurring opinion in Terry v. Ohio, supra, discussed the problem now before us:

"In the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." 392 U.S. at 32–33, 88 S.Ct. at 1885.

■ In order to assess the reasonableness of the officers' conduct here "it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' Camara v. Municipal Court, 387 U.S. 523, 534–535, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)." Terry v. Ohio, 392 U.S. at 20–21, 88 S.Ct. at 1879. The protections of the Fourth Amendment become meaningful only when it is assured that at some point the conduct of the officers is subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of the search or seizure in light of the particular circumstances. *See, e. g.,* Katz v. United States,

389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). In order to justify an intrusion the police must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. at 21, 88 S.Ct. at 1880; Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The Court in *Terry* noted the basic governmental interest of effective crime prevention and detection which underlies the recognition that a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest.

The court, in analyzing the facts in *Terry,* pointed out that:

> "There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further." 392 U.S. at 22–23, 88 S.Ct. at 1881.

It can readily be seen that the officer in *Terry* was confronted with a good deal more upon which to justify a "stop and frisk" than were the officers in the case *sub judice.* Here we have the officers observing defendant leaving a car in a public park, sighting the officers and running back to the car which thereupon exited the park. Later in the same day, upon sighting the officers approaching him, defendant again turns from the officers in an obvious attempt to avoid them and begins hurriedly walking from the park. The officers were of course further aware that an undercover officer had been shot in the park only a few days before.

■ The California Supreme Court, since *Terry,* has adopted the following test to determine whether a forced stop for interrogation or investigative purposes, is justified: There must be a rational suspicion by the police officer that some activity out of the ordinary is or has taken place, some indication to connect the person under suspicion with the unusual activity, and some suggestion that the activity is related to crime. Irwin v. Superior Court, 1 Cal.3d 423, 82 Cal.Rptr. 484, 462 P.2d 12 (1969). We believe that the above is a well founded test in that it allows valid field investigation by the police while at the same time protects the individual citizen's Fourth Amendment rights.

■ In light of the above we believe that Officers Bright and Crum were justified in stopping defendant for the purpose of conducting a limited field interrogation. His action in going to abnormal extremes to avoid uniformed police officers was not only suspicious conduct but also more consistent with criminal than innocent behavior.

We must now consider whether the officers, having justifiably stopped defendant, were justified in seizing his jacket to determine whether he was armed. The "frisk" which *Terry* allows can only be justified where the officer has a rational basis to support his suspicion that the suspect is armed and dangerous. Cunha v.

Superior Court, 2 Cal.3d 352, 85 Cal.Rptr. 160, 466 P.2d 704 (1970). We can envision many instances where an officer might observe suspicious conduct which, while warranting a stop for further investigation, would not warrant that degree of intrusion upon the person of the individual which is necessitated by a "frisk."

When Officers Bright and Crum stopped defendant he had done nothing which would support a suspicion that he was armed, nor was there any reason for suspecting that he had committed or was in the act of committing any crime of violence, as was the case in *Terry.* And while it is true that the officers were aware that an undercover officer had been shot in the park just a few days before, there was no reason to suspect that the defendant was connected to that crime. Nor do we believe that the mere fact that the defendant was walking with his jacket slung over his shoulder in a manner concealing his left arm would justify a suspicion that he was armed.

■ However, it would be totally unrealistic if we failed to recognize that events may occur during even the most informal and pleasant confrontation between police and citizen which drastically alter the course which the officer is justified in taking. See Terry v. Ohio, 392 U.S. at 13, 88 S.Ct. 1868. Here, it is apparent from the record that, when approached by the officers and questioned, defendant was not merely uncooperative but rather that he was abusive in his language to the point of being threatening. This conduct, when considered in light of the above mentioned facts, was such that would support a rational belief that the defendant might be armed and dangerous. The officers at that point expressed their fears to defendant and asked him if they could see what was concealed in his left hand. Defendant replied "None of your fucking business," and the officers immediately seized the jacket from his shoulder in order to uncover the arm and hand. Under the unique circumstances of this case

the seizure of the jacket was the only way in which the officers could have readily determined whether defendant did, in fact, have a weapon in his hand and therefore such action was not improper.

■ We conclude that the marijuana and LSD seized from defendant were properly admitted into evidence against him. At the time the officers stopped defendant they had reasonable grounds to suspect that he might be engaged in criminal activity and his subsequent conduct, when coupled with his suspicious actions, constituted a justification for the officers "to take swift measures to discover the true facts and neutralize the threat of harm if it materialized." Terry v. Ohio, 392 U.S. at 30, 88 S.Ct. at 1884. Defendant's resistance of the officers' attempt and the resulting assault upon them was therefore unlawful and the subsequent search of defendant's person was valid incident to a lawful arrest.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.