504 P.2d 1307

**STATE of Arizona, Appellee,**

v.

**Jose Antonio RUIZ, Appellant.**

**No. I CA–CR 369.**

Court of Appeals of Arizona,
Division 1,
Department B.

Jan. 16, 1973.

Rehearing Denied Feb. 21, 1973.

Review Denied March 27, 1973.

Gary K. Nelson, Atty. Gen. by Louis A. Moore, Jr., and Tom Jacobs, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Anne Kappes, Deputy Public Defender, Phoenix, for appellant.

HAIRE, Judge.

Defendant Jose Antonio Ruiz was convicted of the crime of possession of marijuana, a felony, and was sentenced to a term in the Arizona State Prison. He appeals, contending that the evidence which led to his conviction was obtained as a result of an unlawful search and seizure, and therefore inadmissible.

The defendant filed a motion to suppress which was submitted to the trial court upon the record made at the defendant's preliminary hearing, with the further stipulation that if the trial court denied the motion to suppress, then defendant's guilt or innocence should also be determined from the preliminary hearing record. The facts, as disclosed by the preliminary hearing record and pertinent to defendant's contention that his initial detention and subsequent search were violative of his Fourth Amendment rights, are as follows:

Two City of Phoenix police officers were working a walking beat on a Sunday afternoon, on West Buckeye Road in the Southwestern part of Phoenix, Arizona. Neither officer had any recollection of ever having seen defendant, who is of Mexican descent, prior to observing him entering a liquor store in the area covered by their walking beat on the afternoon in question. The officers testified that it was very unusual to see a person of either "white" or Mexican descent in this particular area, and that it had been their experience in the past that the few "whites" or Mexicans who were in the area were there for the purpose of purchasing narcotics.

The officers observed defendant enter the liquor store, watched him purchase a package of cigarettes, and then as he left, they stopped him in order to ask him a few

questions. In the words of Officer Marshall, the following transpired:

"A After he entered Lincoln Liquors he went to the cigarette counter and bought a package of cigarettes and exited through the door. We followed him and I stopped him and asked him for some form of identification. At that time he produced an expired driver's license. Through the normal routine of interrogation I asked him certain questions, what he was in the area for, and his general background. He related he had just gotten out of jail for a previous charge.

While on the sidewalk talking to the subject—he was smoking a cigar and had it in his mouth and during this time he was playing with it; he rolled it between his teeth while we were talking to him. I was standing directly in front of him while he was smoking this cigar and I noticed inside his mouth lying between his tongue and teeth what appeared to be a yellow balloon type quite similar to what marijuana or narcotics is sold in in this area.

I asked the subject to spit it out and he made an attempt to swallow it and I made an attempt to keep him from swallowing the balloon. I failed and he swallowed the balloon and I placed him under arrest at that time. I moved him to the police car, searched him and in his left front pant pocket I found what appeared to be a marijuana cigarette.

At this time he was charged and while en route downtown I advised him of his rights from the standard rights card."

Officer Medigovich testified as follows:

"Q After you got out and interrogated him what happened?

"A We observe a large cigar in his mouth. We were just about ready to release him when we noticed a bright yellow balloon in his mouth. We asked what was in his mouth and he said, nothing. We asked him to spit it out and he said he had nothing so we tried to make him spit it out but he didn't.

"Q You say you were about ready to release him?

"A Yes.

"Q Was he in custody?

"A No. We were interrogating him. West Buckeye Road is mainly a Negro district and any Mexicans or white people in the area are suspicious.

\* \* \* \* \* \*

"Q Did you actually see a balloon inside his mouth?

"A Yes.

"Q The whole thing?

"A It was about an inch long and tied on the one end and bright yellow.

"Q In what area of his mouth?

"A Right behind his lower teeth.

"Q Under his tongue?

"A Not quite under his tongue. Right behind the bottom jaw.

"Q Did you ever retrieve it or get a hold of it?

"A We attempted to but couldn't."

Based upon the marijuana cigarette found in defendant's possession as a result of the search, he was convicted and, as previously indicated, sentenced to a term in the Arizona State Prison.

◼ We first consider whether, under the circumstances, the initial detention of defendant for questioning was in violation of his Fourth Amendment rights. Obviously, at the time of defendant's initial detention, the officers did not have probable cause to arrest him. Further, we think it clear that the initial stopping of defendant by the officers, although not an arrest, did constitute a "seizure" of him within the meaning of the Fourth Amendment to the United States Constitution. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Baltier, 17 Ariz.App. 441, 498 P.2d 515 (1972). However, as held by the United States Supreme Court in Terry, *supra,* not every seizure of the

person without probable cause constitutes a violation of that person's Fourth Amendment rights. Only those seizures which are "unreasonable" are proscribed, and Terry recognizes the necessity of police field interrogation procedures "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . ." (392 U.S. at 30, 88 S.Ct. at 1884).

In matters concerning field interrogations conducted without the prerequisite "probable cause" necessary for a lawful arrest, the central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Terry further defines this "reasonableness in all the circumstances" test by stating that the court's "inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (392 U.S. at 19–21, 88 S.Ct. at 1878–1880).

The tests set forth in Terry for assessing reasonableness in field interrogation cases are quite general and of necessity not capable of being stated with mathematical precision, for as stated in Terry, "[n]o judicial opinion can comprehend the protean variety of the street encounter. . . ." In our opinion, the 9th Circuit Court of Appeals has succinctly stated the rationale subsequently adopted by the United States Supreme Court in Terry in its decision in Wilson v. Porter, 361 F.2d 412 (9th Cir. 1966), as follows:

"A line between reasonable detention for routine investigation and detention which can be characterized as capricious and arbitrary cannot neatly be drawn. But due regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing." (361 F.2d at 415).

Applying the Terry dual approach test, the evidence reveals that here the police officers observed defendant in an unusual situation which, in light of their experience, gave rise to a reasonable suspicion on their part that criminal activity might be afoot. We thus conclude that their action in initially stopping the defendant for the limited purpose of questioning him was justified, and that the first prong of the Terry dual approach test has been satisfied.

■ The next inquiry is whether after the initial stopping, the officers' actions were "reasonably related in scope to the circumstances which justified the interference in the first place". Immediately after the stopping of defendant, the scope of the officers' activities was limited to a general questioning of defendant concerning such matters as his identity and his reasons for being in the area. Initially there was no attempt to search defendant's person, even to the limited extent approved in Terry, *supra*. See also, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). We therefore hold that the second prong of the Terry dual approach test was satisfied, that is, that the officers' activities in questioning defendant immediately after his detention were reasonably related in scope to the circumstances which justified the interference in the first place.

■ We are not unmindful of the fact that defendant was subsequently searched, and that it was through that search that the marijuana cigarette was discovered

which led to his conviction. However, in our opinion that subsequent search was not incident to the initial field interrogation, and indeed, under the principles enunciated in Terry, could not have been justified by the facts known to the officers prior to the detention of defendant for the field interrogation. On the other hand, such a search can be fully justified as a search incident to an arrest based upon probable cause. The facts developed by the officers during their questioning of defendant furnished an adequate basis for probable cause to believe that defendant was committing a felony in the officers' presence —namely the unlawful possession of narcotics. The evidence shows that the officers had completed their questioning of defendant and were just about ready to release him so that he could go on his way when they saw a yellow balloon in his mouth, a balloon of the type that marijuana or other narcotics were sold in, in the area. The officers asked defendant for the balloon, and defendant then attempted to and did swallow it, after a struggle during which the officers tried to obtain it. At this point the officers clearly had probable cause to, and did, arrest defendant, and the subsequent search which revealed the marijuana cigarette was a lawful search incident to that arrest. Many authorities have recognized that while a search might not have been justified at the time of the initial field interrogation detention, additional evidence developed during the field interrogation detention through the officers' observations might be sufficient to create probable cause so as to justify an arrest and a subsequent search incident to that arrest. *See* State v. Washington, 107 Ariz. 521, 489 P.2d 1201 (1971); Terry, *supra*; Adams, *supra*; Wilson, *supra*; United States v. Madril, 445 F.2d 827 (9th Cir. 1971), vacated on other grounds, 404 U.S. 1010, 92 S.Ct. 692, 30 L.Ed.2d 657 (1972); United States v. Oswald, 441 F.2d 44 (9th Cir. 1971).

We therefore hold that the trial court properly denied defendant's motion to suppress and that the evidence which led to

defendant's conviction was properly admissible.

The judgment and sentence entered by the trial court are affirmed.

Affirmed.

JACOBSON, C. J., Division 1, and EUBANK, P. J., Department B, concur.