508 P.2d 764

**The STATE of Arizona, Appellant,**

v.

**Maurice Vernon RHODES, Appellee.**

**No. I CA–CR 494.**

Court of Appeals of Arizona,
Division 1,
Department A.

April 17, 1973.

Moise E. Berger, Maricopa County Atty., by Robert F. Retzer, Jr., Deputy County Atty., Phoenix, for appellant.

Debus, Busby & Green, Ltd., by Larry L. Debus and Jordan L. Green, Phoenix, for appellee.

DONOFRIO, Presiding Judge.

This is an appeal by the State of Arizona from an order of the Superior Court of Maricopa County suppressing evidence in the criminal cause started by grand jury indictment against Maurice V. Rhodes, hereafter referred to as the defendant.

The sole issue dispositive of this appeal is whether the trial court abused its discretion in sustaining objections to questions asked by the County Attorney of investigating officers at a pretrial motion to suppress evidence hearing. The questions asked concerned statements made by defendant when the officers approached a car in which defendant was seated. The car was parked on the grass of a public park in the City of Phoenix.

We briefly set forth the facts produced at the hearing up to the time the trial court sustained defendant's objections to the officer's evidence. The hearing began with Officer Neal Mawk testifying that he was a patrolman with the City of Phoenix Police Department, having been employed by the City approximately four years; that he and his partner, Officer Tom Ruhl, were patrolling at about 7:00 a.m. on October 14, 1971, in the vicinity of 47th Avenue and Osborn Road when they noticed a customized two-door Chevrolet automobile parked on the grass ("backed up on the grass") of Orme Park, a small park in a residential area; that they approached the car and saw two people sitting in it. The officer then testified that he approached the car because it was an unusual time of the morning and because the car was

parked on the grass, which he believed to be a violation of the City Code. The officer further testified that defendant was sitting behind the steering wheel; that upon approaching the car the officers could see several stereo tapes "laying on the floor and in the back seat"; that there were wrappers "laying all over the interior of the vehicle"; and that defendant and the other occupant were in the process of "unwrapping" some of the tapes. Officer Mawk testified as follows as to what then took place:

"Q What, if anything, did you do upon seeing this?

"A We asked him [the defendant] why he was there.

"Q What, if anything, did he respond?

"A I don't recall his exact words at that time.

"Q Did you ask him any other questions?

"A Yes, sir.

"Q What did you ask him?

"A We asked him about the tapes.

"Q What did he respond, if anything?

"A He stated that—

"MR. DEBUS: [defense counsel] I object on the basis of foundation.

"THE COURT: Objection sustained.

"Q BY MR. RETZER: [Deputy County Attorney] Who was present at the time that you asked him these questions?

"A Myself, Officer Tom Ruhl, and Carmen Espinoza.

"Q Was she the only other person in the car besides Mr. Rhodes?

"A Yes.

"Q At approximately what time was this when you were asking these questions?

"A Approximately around 7:00, 7:15, or shortly thereafter.

"Q What did you ask him in reference to the tapes?

"MR. DEBUS: Same objection.

"THE COURT: The objection is sustained.

"MR. RETZER: Just as to foundation is insufficient. I would ask defense counsel to say what specifically is lacking in foundation.

"THE COURT: Do you want to respond to him?

"MR. DEBUS: Apparently the Court is aware, Your Honor, it sustained the objection, that just basically we have a situation where two uniformed police officers are beginning an inquisitory investigation and interrogation, if you will. All of those facts need to be related. Other matters need to be brought out to otherwise hearsay evidence. The objection, of course, of foundation is incorporated with the hearsay objection. We'll restate both of those objections at this time.

"MR. RETZER: Your Honor, the State will avow to the Court that these statements are an exception to the hearsay rule, and they will be an admission against interest. This was not an inquisitory investigation, it's on the scene. It isn't accusatory.

"THE COURT: Why do you say that?

"MR. RETZER: At this time they approached the car, saw the tapes, and asked him where they got the tapes.

"THE COURT: The objection will be sustained.

"MR. RETZER: Sustained, Your Honor?

"THE COURT: Yes."

The State then brought out from the officer that at that time he did not suspect that the defendant was involved in a crime and that he asked the questions because he was curious. The officer testified that the tapes in plain view were in excess of ten. Again, we quote the record:

"Q Is it at this time that you asked the defendant where he obtained these tapes?

"A Yes, sir.

"Q And what, if anything, did he respond when you asked him where he got the tapes?

"MR. DEBUS: Objection, Your Honor, hearsay and foundation.

"THE COURT: The objection is sustained.

"MR. RETZER: Your Honor, I would again ask what foundation is lacking.

"THE COURT: I don't think you can come into Court, and a police officer says I wanted to ask him questions because I'm curious. Police officers can't go around looking in people's cars and questioning people because they're curious. He must have had some good reason for questioning the defendant. If he did, he should have advised him of his rights and shouldn't have asked him any questions. You are playing foolish with what the law is. This is something you can't say the officer is curious and we can ask any questions we wish. This is going a little bit far, and making a sham out of the case. The police could say, 'I'm curious, I didn't have any other purpose except being curious,' and that would just be flouting what the higher courts are saying what the law is.

"MR. RETZER: I believe the State has shown that the officers were legally at the car. It was early in the morning. The car was parked up on the grass, which is unusual. I think these are circumstances which would give a police officer a right to go up to a car to investigate to find out what the car is doing parked at 7:30 in the morning, which is unusual. The Arizona Supreme Court, Arizona vs. Mummert, stated that the police officers do not have to give the Miranda warnings unless in fact the defendant is in custody. Merely asking a question of a defendant or a person at the time, the courts have held it is not illegal. I would cite the citation to the Court it was in the December issue of the Arizona Weekly Gazette. The officer had no idea that a crime had been committed.

"THE COURT: Why was he questioning him then?

"MR. RETZER: Mere questioning, mere doing his duties.

"THE COURT: If he didn't suspect that a crime had been committed, the fact that a person has over ten tapes in an automobile does not give the officer the right to start questioning him unless he has some suspicion that a crime has been committed. I mean are the police going around, everybody that's got some tapes in their car, and go around and say, 'Okay, I'm going to question them because I'm just curious.' This is not the law now. I don't think it is quite that simple. What if the defendant had started up his car and started out of the area? Now what would have happened?"

It is to be noted that the Miranda warnings are not involved at this point as the officer testified to the effect that defendant's freedom of action was not significantly impaired at the time of the questioning. State v. Mumbaugh, 107 Ariz. 589, 491 P.2d 443 (1971). Pertinent on this point is the following testimony:

"Q BY MR. RETZER: Officer, at the time you went up to the car and saw the tapes and then asked the defendant where he had gotten the tapes, at that time—you previously stated that you did not—

"THE COURT: You don't have to go back over this. Just don't ask him leading questions.

"Q BY MR. RETZER: Was the defendant in custody at that time?

"A No, sir.

"Q Was the defendant free to leave at that time had he wanted?

"A Yes, sir.

"Q If he had tried to leave, would you have stopped him?

"A I don't think so."

From here on it would appear that the County Attorney was attempting to bring out voluntary conflicting statements made by the defendant during his conversation with the officer so as to show probable cause for the subsequent arrest and seizure of the tapes. It also appears that by the court's ruling he was prevented from doing so, the trial court obviously taking the position that the circumstances were such that the officers were violating defendant's constitutional rights by asking the questions which brought about the conflicting statements. On the other hand, it is the State's position that the officer had observed enough unusual conduct to justify the questions asked, and that the field interrogation under the circumstances was constitutionally permissible. The following dialogue reflects the efforts of the prosecution to introduce the evidence:

"THE COURT: The previous ruling of the Court will stand.

"MR. RETZER: Your Honor, I fail to see how we can have a Motion to Suppress if the facts cannot come out under what conditions the evidence was seized. That's merely what the State's trying to do. The State should be allowed to bring these facts out. If the Court decides to strike it, it [sic] that's one thing. I can't get these facts out right now, not being allowed to even present the facts to the Court so the Court can rule.

"THE COURT: I have to rule on the questions as they come up. If you have any further questions, you may proceed."

▋ The question before us is whether the officers were within the proprieties of the law in asking the questions, i. e., whether they were within legitimate investigative limits. As Chief Justice Warren stated in the case of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the exclusionary rule has its limitations as a tool of judicial control. It cannot be properly invoked to exclude the products of legitimate police investigative techniques.

Although dealing with a warrantless search, the recent case of State v. Ruiz, 19 Ariz.App. 84, 504 P.2d 1307 (1973), expounding on the philosophy and holding of Terry, supra, is helpful. In this case police officers observed a person of Mexican descent in an area not frequented by such persons and stopped him on the street for interrogation. During the course of the interrogation they saw something that made them suspicious of a narcotics violation. They then proceeded to search him. Considering the stopping of that defendant a seizure within the meaning of the Fourth Amendment to the United States Constitution, Judge Haire stated:

"... However, as held by the United States Supreme Court in Terry, supra, not every seizure of the person without probable cause constitutes a violation of that person's Fourth Amendment rights. Only those seizures which are 'unreasonable' are proscribed, and Terry recognizes the necessity of police field interrogation procedures 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . .' (392 U.S. at 30, 88 S.Ct. at 1884).

"In matters concerning field interrogations conducted without the prerequisite 'probable cause' necessary for a lawful arrest, the central inquiry is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' Terry further defines this 'reasonableness in all the circumstances' test by stating that the court's 'inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. . . . And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to

the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' (392 U.S. at 19–21, 88 S.Ct. at 1878–1880).

. . . . . .

"Applying the Terry dual approach test, the evidence reveals that here the police officers observed defendant in an unusual situation which, in light of their experience, gave rise to a reasonable suspicion on their part that criminal activity might be afoot. We thus conclude that their action in initially stopping the defendant for the limited purpose of questioning him was justified, and that the first prong of the Terry dual approach test has been satisfied.

"The next inquiry is whether after the initial stopping, the officers' actions were 'reasonably related in scope to the circumstances which justified the interference in the first place'. Immediately after the stopping of defendant, the scope of the officers' activities was limited to a general questioning of defendant concerning such matters as his identity and his reasons for being in the area. Initially there was no attempt to search defendant's person, even to the limited extent approved in Terry, *supra*. *See also*, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). We therefore hold that the second prong of the Terry dual approach test was satisfied, that is, that the officers' activities in questioning defendant immediately after his detention were reasonably related in scope to the circumstances which justified the interference in the first place."

Applying this reasoning to the instant case, we believe the officers had observed enough unusual conduct with reference to the car to justify going to it and making an investigation. What they thereafter observed in plain view, particularly the fact that the two occupants were unwrapping the tapes in the car, could well arouse the officers' suspicions that something was not right and thus justify their asking questions about the tapes.

Regardless of how the evidence would be viewed after it was all in, the fact remains that the trial court was in error in not permitting counsel to present his evidence. There was no preliminary hearing to look to for the facts. The transcript of the grand jury hearing did not reveal the testimony by the officers. It showed only that a city detective appeared before the grand jury and related the facts from reports.

The prosecution did not make an offer of proof, but as we are able to gather from the pleadings, memoranda and briefs, the State intended to offer proof that the defendant told the police he "bought the tapes from 16th Street and Buckeye"; that later in the conversation he changed his story to say he took them to settle a $10.00 debt. Due to the number of tapes observed, "a total of fifty-two (52)", the officer said he did not believe this. The suspect then increased the value to $20.00. The defendant then said he and the other occupant of the car got the tapes the previous night from a friend, John, at Helsing's restaurant on Central Avenue. This was contrary to his statement regarding the 16th Street and Buckeye location. Faced with a hearing on a motion to suppress, it was incumbent on the prosecution to show a lawful basis for warrantless seizure of the tapes. The offered evidence was material and relevant.

■ How much of the facts the prosecution will be able to show at a hearing we do not know, nor do we know how the trial court would rule in the matter after hearing the evidence. For this reason it is premature for this Court to pass upon the merits. We believe, however, that enough of a foundation has been shown to ask the questions. To reiterate, the act of approaching the car parked on the grass at that time was reasonable. Seeing the large quantity of tapes and wrappers lying all over the interior of the vehicle, and seeing

**510**

the occupants in the process of unwrapping some of the tapes is sufficient to create some suspicion and basis for the interrogation.

Reversed.

OGG and STEVENS, JJ., concur.