**UNITED STATES of America**

v.

**Albert BETEMIT, et al.**

**Crim. No. 3:95cr64.**

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 27, 1995.

N. George Metcalf, Assistant United States Attorney, United States Attorney's Office, Richmond, Virginia, for U.S.

Sa'ad El–Amin, El–Amin & Crawford, P.C., Richmond, Virginia, for Betemit.

William M. Ferguson, III, Newport News, Virginia, for Banks.

Robert J. Wagner, Richmond, Virginia, for Hewlett.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the court on the motion of defendant, Albert Betemit, also known as Jose Torres (hereinafter "Betemit/Torres"), to suppress admission into evidence of two weapons and approximately $20,000 in cash seized from a car driven by Betemit/Torres, and registered in the name of Jose Torres, which was searched following an investigatory stop under the circumstances related below. For the reasons set forth, the Motion to Suppress is granted.

## STATEMENT OF FACTS

On February 9, 1995, Lieutenant Mona McLaurin, a member of the Hampton University Police Department, noticed a silver-colored, 500 series Mercedes, with tinted windows and North Carolina license plates arrive at Ogden Hall, a concert facility located on the campus of Hampton University, the student body of which is predominantly black. The event of the evening was a talent and fashion show attended by a predominantly black audience. As the automobile approached Ogden Hall, it circled the driveway in front of the facility three or four times. The Mercedes stopped in a fire lane. Three young, black males, later identified as Betemit/Torres, Damon Reid and Frederick Paula, emerged and one of them, later identified as Reid, asked McLaurin whether he and his friends, as non-students, could attend the event about to get under way that evening. McLaurin informed Reid that the event was open to the public and that he and

his friends were welcome to attend. Reid returned to the Mercedes which departed toward a parking area.

Shortly thereafter, the three occupants returned and entered Ogden Hall. McLaurin expressed the view that all three, who were young black males, did not appear to "fit in" with the crowd attending the event because of their attire. McLaurin, however, did not explain why she considered their attire to be unusual. McLaurin also thought it odd to see such an expensive car driven by such young people. And, although she had seen other expensive automobiles on the campus, she had never seen one of this make and model there.

In the approximately 30 minutes after the three young men entered Ogden Hall, Reid exited the facility on four or five occasions to talk on a cellular telephone. Betemit/Torres also left the facility a "few" times and also talked on a cellular telephone. During one of Reid's conversations, McLaurin overheard him say "yeah, we can do that" and "stay there." Officer Calhoun, another member of the Hampton University Police Department, also overheard one of Reid's conversations. She recalled hearing him say "yeah, we can deliver." McLaurin and Calhoun described both men as "anxious," "intense" or "upset."

On the basis of this information, McLaurin, using radio communication, requested a license and registration check of the Mercedes. The response, communicated also by radio, was that the vehicle was registered in the name of "Jose Torres." McLaurin recalled having heard that name previously while she was in attendance at a drug investigation training course at the Hampton Police Department, but she could not remember the context in which the name had arisen. Nor could she remember any comment made about Torres or anything else about him.

Calhoun confirmed McLaurin's general description of the events marking the arrival of the three occupants of the Mercedes at Ogden Hall and their attendance at the talent and fashion show. Although McLaurin testified that she suspected that Reid was talking on a cellular phone about drugs because of his nervous behavior and the fact that he was

using a cellular telephone, Calhoun said that she did not suspect that the occupants of the Mercedes were drug dealers even though she considered their conduct to be suspicious generally.

After the occupants had been at the talent and fashion show for approximately 30 minutes, Reid approached McLaurin and queried whether the three men could return to Ogden Hall if they "left for awhile." McLaurin responded in the affirmative. All three men then returned to the automobile and left Ogden Hall.

Corporal Knight, another Hampton University police officer, heard McLaurin's radio communication requesting a license and registration check on the Mercedes as well as the response. Shortly after the vehicle departed Ogden Hall, Knight came upon it parked in front of the Dirt Busters Laundromat in an area on campus called Hampton Harbor, a retail strip shopping mall. Knight saw no one in the Mercedes and did not know which, if any, of the shops in Hampton Harbor the occupants were visiting and he observed no suspicious activity while the vehicle was parked there.

Having heard McLaurin's previous radio communication about the Mercedes, however, Knight reported to her that it was then located at Hampton Harbor. McLaurin and Knight testified that Hampton Harbor generally was known on the campus as an area where drug transactions took place regularly. The record also shows that Hampton Harbor is a legitimate shopping area frequented by the student public at large. None of the testimony connected drug activity with the laundromat or with the area of Hampton Harbor where the Mercedes was parked.

Shortly after Knight's communication, the three men and the Mercedes returned to Ogden Hall and to the talent show. The Mercedes parked in the fire lane, but, after Calhoun warned the driver against parking there he moved the vehicle. All three men remained in Ogden Hall until the conclusion of the event, approximately 20 minutes later, and left in the company of two young women,

identified later as Hampton University students. As the Mercedes left the area, McLaurin noticed that it was headed in the direction of McGrew Tower, a dormitory which housed female students, rather than toward the exit from campus.

McLaurin radioed Sergeant Darby and instructed him to stop the car and do a "field interview" of the occupants to find out who they were and why they were on campus. On cross examination, McLaurin admitted that she found "reasonable suspicion" to stop the vehicle in the fact that the occupants of the vehicle were young, black males and that the car was a very expensive one. On direct examination, McLaurin included, as among the foundation of her "reasonable suspicion," the use of a cellular telephone by Reid and Betemit/Torres and the segments of Reid's conversations that she overheard. Darby then radioed instructions to Knight whose testimony is that he received a radio transmission to stop the vehicle because of suspicious activity. Knight testified that the nature of suspicious activity was not articulated in his instructions. Knight was instructed to intercept the Mercedes and to determine who the occupants were and why they were on campus. Having been informed that the Mercedes was at one time parked in the fire lane in front of Ogden Hall, Darby also mentioned that the driver should be warned against parking in a fire lane.[1] Having been so informed, Knight pulled behind the Mercedes and flashed his emergency lights. The vehicle stopped immediately, pulling over into the fire lane in front of McGrew Tower.

Knight immediately radioed for a license plate check and determined that the vehicle was registered to Jose Torres. Knight then approached the Mercedes and requested the driver to produce a driver's license and registration. The driver complied by producing a license and registration both of which were in the name of Jose Torres. The two women then exited the vehicle, were identified as students of Hampton University and were allowed to go on their way. Knight asked for the names of the passengers and Reid, who

---

1. McLaurin advises that it was her idea to issue that warning and that it was one reason for the stop. The court believes Darby, whose testimony establishes that the so-called warning was an after-thought to make weight for the stop which McLaurin previously had ordered.

was sitting in the back seat, began to yell profanities and to question the authority of Knight to ask questions, saying "we don't have to tell you motherfuckers a goddamn thing."

Concerned for his safety, Knight backed away from the vehicle and asked all three occupants to get out of the car. All three complied with this instruction and, according to Knight, Betemit/Torres attempted to calm Reid, but Reid continued to act in an aggressive manner and to use foul language. Knight, and the other officers who had arrived in response to Knight's call for back-up, conducted a pat down search of all three occupants for weapons. In each instance, the result was negative.

According to Knight, he asked Betemit/Torres for permission to search the vehicle and Torres replied "do what you have to do." Therefore, Knight opened the door and found a bottle of Hennessy brandy and a bottle of soda in a pouch on one of the doors. He then located a .38 caliber pistol in a pouch located on the reverse side of the right front passenger seat. He also found a leather jacket containing what he described as a "large sum of money" (later determined to be $2,505.00).

At that point, all three occupants of the Mercedes were placed under arrest. Betemit/Torres and Reid were charged with possession of a firearm. Knight also issued a citation to Betemit/Torres for parking in a fire lane. The record does not disclose why the third occupant was arrested.

After Reid became obstreperous and Knight issued a call for backup, Darby responded and arrived upon the scene, apparently while Knight was searching the Mercedes. However, Darby was unaware that Betemit/Torres had given permission for the

search and so he asked Betemit/Torres whether he "had a problem with search of the vehicle." At this time, Reid was protesting the search vehemently and Betemit/Torres replied that he "did have a problem with the search" which Darby construed as an objection to the continued search. Darby reported this information to McLaurin, the senior officer on the scene. By that time, Detective Clyde M. Robinson, a member of the Hampton Police Department, had arrived and advised that the search could continue because of the "Carroll Doctrine" (referring to *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). According to Darby, Knight then reported having found the gun.

No one told Knight to cease the search. One of the officers found $18,485.00 in cash in a white plastic bag in the trunk. The Mercedes was towed to police headquarters after the occupants were arrested. The tow truck operator found a .45 caliber weapon in the car while conducting an inventory in association with storage of the car.

■ All three occupants initially disclaimed ownership of the .38 caliber weapon found in the car by Knight. Later, however, Reid claimed it. None of the occupants have claimed ownership of the money or the .45 caliber pistol found in the trunk of the Mercedes.[2]

## DISCUSSION

■ An investigative stop which amounts to a seizure within the meaning of the Fourth Amendment must be "supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity," *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890

---

2. The United States contends that Betemit/Torres lacks standing to bring this motion to suppress because he denied ownership of the weapons and the money and because the car was registered in the name of Jose Torres, an alias attributed to Betemit in the indictment, but to which he has not yet admitted. Unlawful possession of property bars a Fourth Amendment challenge to the search and seizure of evidence therefrom because the possessor lacks a reasonable expectation of privacy and has no standing to challenge the search. *United States v. Ladd,* 704 F.2d 134

(4th Cir.1983). The undisputed record, however, shows that the Mercedes was registered to Torres and that photographs and fingerprints of Torres confirm that he is in fact Betemit. McLaurin identified Betemit as the person driving the automobile on that evening at Ogden Hall and at McGrew Tower. All the evidence shows that Betemit/Torres was in lawful possession of the Mercedes. Under these circumstances, the half-hearted effort of the United States to oppose Betemit/Torres's standing must be rejected.

(1990) (citations omitted). This means that the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1967). As the United States Court of Appeals for the Fourth Circuit held in *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982):

> In enforcing this principle, the courts must apply objective standards in determining whether at the time of the seizure the requisite degree of suspicion existed. [citation omitted] In doing this they should of course take into account that trained law enforcement officers may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' [citations omitted]. Still, any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officer's subjective assertions, if the courts rather than the police are to be the ultimate enforcers of the principle. [citations omitted]

*United States v. Gooding*, 695 F.2d at 82; *see also Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979).

Against this background it is important to recall the controlling principle of *Terry* and its progeny which is that:

> [a] brief investigative stop is permissible when the investigating officers have a *reasonable suspicion grounded* in 'specific and articulable *facts' that* the person stopped *is, is about to be, or has been involved in criminal activity.* [citations omitted]

*United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988) (emphasis added).

The determination whether reasonable suspicion of criminal activity exists is made on the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981) and the reasonable suspicion standard is not an onerous one, considering that the intrusion on personal liberty created by an investigatory stop is a minimal, albeit nonetheless severe, one. Notwithstanding that the constitutional requirement for a reasonably articulable suspicion to support an investigative stop or seizure has necessarily and justifiably become a lenient one, "it nevertheless protects a precious right—hard earned and easily lost—to be free of arbitrary police intrusions on individual privacy and free movement." *United States v. Gooding*, 695 F.2d at 84. Application of these controlling principles to the investigatory stop here at issue establishes that there did not exist a reasonable suspicion that the occupants of the Mercedes were, had been, or were about to be, engaged in criminal activity. The circumstances giving rise to the investigatory stop here began when three young, black men entered the campus of a predominantly black college in an expensive automobile to attend a fashion and talent show which was open to the public and which was attended predominantly by black people. Viewed objectively, there is nothing in those developments to warrant a reasonable suspicion that criminal activity is afoot.

Thereafter, the group exhibited distinctly non-criminal activity when they twice approached law enforcement officers asking first if they could attend the show and later whether they could leave the event and return. Although one factor in the *Terry* calculus may be a person's reaction upon the appearance of a police officer,[3] in this case the suspect individuals engaged in behavior which is consistent with that expected of law-abiding citizens, not of people desiring to avoid attracting the attention of the police so that they will not be followed, or so that their activities will not be observed, or so that they cannot be identified later. Although it is common knowledge that drug dealers use cellular telephones, it is not common that they do so in the open and obvious presence of police officers. It is also common knowledge that large numbers of citizens use cellular telephones in public places for a wide range of lawful purposes. Thus, the use of a cellular telephone by Reid and Betemit/Tor-

---

3. *See, e.g., United States v. Tate*, 648 F.2d 939 (4th Cir.1981) (a relevant factor to consider was that "defendant and his companion appeared to be hiding their faces from the view of the detectives").

res, standing alone, does not signal criminal activity.

■ True, the appearance and manner of dress of the three men caused McLaurin to conclude that they did not "fit in," although McLaurin could not articulate exactly what she meant by the observation that the three men did not "fit in." But, while appearance and manner of dress may be a legitimate factor to consider in the *Terry* analysis,[4] it in itself is not sufficient to support a reasonable, articulable suspicion that criminal activity is afoot.[5] Moreover, appearance considerations must be viewed in context of the situation. For example, it may be suspicious to see a stranger in a seldom-travelled rural area at 1 a.m.,[6] but not suspicious at all to see a strange car at 1 a.m. in a vacation community following a public festival or celebration. Similarly, where it normally may have been unusual for McLaurin to see students on campus dressed as the defendants were dressed (whatever that might have been), it does not follow that it is unusual to see young visitors to a campus event which is open to the general public who are attired differently than students.

■ Likewise, an officer may consider the fact that a person is a stranger to the officer's normal patrol area or beat in assessing the level and nature of suspicion which exists.[7] However, given that this event was open to the public, there were any number of people on campus that night who would be strangers to the officers. Consequently, that factor carries little, if any, weight here.

It is also a matter of record that Betemit/Torres and his companions visited an area of campus known as an area where drug trafficking regularly took place. Knowledge that an area is known to be a site of frequent criminal activity is also a factor in the *Terry* consideration,[8] but it alone is never a sufficient basis to make an investigative stop. *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (where officer saw defendant and another man walk away from each other in an alley in an area known for its frequent drug traffic, but there was no indication it was unusual for people to be in the alley and the police did not point to any facts supporting their conclusion that the situation "looked suspicious," there were no legitimate grounds for a stop). However, no one witnessed the defendants do anything suspicious while in Hampton Harbor. Further, the record shows that Hampton Harbor was a retail shopping area frequented both by people with legitimate purposes and by those engaged in drug commerce. Under these circumstances, the presence of the Mercedes in the parking area of Hampton Harbor neither signifies nor foreshadows criminal activity.

The statements made by Reid that "we can do that," "stay there," and "we can deliver"[9] are relatively innocuous in isolation. Considered in context of a subsequent trip to an area where drug trafficking had occurred, these remarks are much more suspicious, particularly the use of the term "deliver." However, even taking the statements in that

4. See, e.g., *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (defendant's casual dress, youth and heavy luggage in combination with other suspicious behavior justified initial investigative detention); *United States v. McFarley,* 991 F.2d 1188, 1192 (4th Cir.1983) ("'fresh'" and "well dressed" men arriving on a bus from New York City aided in creating an articulable suspicion).

5. *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (the officer's general assertion that defendant "looked suspicious" was insufficient to justify a *Terry* stop).

6. *United States v. Holland,* 510 F.2d 453 (9th Cir.), *cert. denied,* 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975).

7. The officer's familiarity with people in his patrol area is frequently stressed. 3 Wayne R. LaFave, Search and Seizure, § 9.3(c) (2d ed. 1987); *Racine v. State,* 286 So.2d 890 (Ala.1973); *State v. Ruiz,* 19 Ariz.App. 84, 504 P.2d 1307 (1973); *People v. Higbee,* 37 Cal.App.3d 944, 112 Cal.Rptr. 690 (1974); *People v. McGowan,* 45 Ill.App.3d 61, 3 Ill.Dec. 810, 359 N.E.2d 220 (1977).

8. *See e.g., United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975); *United States v. Moore,* 817 F.2d 1105, 1107 (4th Cir.1987).

9. Calhoun understood Reid to have made the last statement referring to "delivery" and said that she reported it to McLaurin. McLaurin, however, did not testify that she received such a report.

context, they do not provide a reasonable suspicion that drug activity is, has been, or is about to be, afoot by the occupants of the car when it is remembered that Hampton Harbor is the home of both legal and illicit activity.

The fact is that singly, these incidents do not amount to much. Even collectively, they do not constitute a reasonable, articulable suspicion that any criminal activity was, had been, or was about to be, afoot. This is confirmed by McLaurin's admission on cross-examination that she acted because her suspicion was aroused by the presence of three young black male non-students in an expensive car with out-of-state plates and tinted windows. Although McLaurin testified otherwise on direct examination and tried to dig herself out of ·that hole later during cross-examination, the expression on her face, the tone of her voice and her demeanor reflected that she told the truth in admitting that the real reason for her actions was that the expensive car with tinted windows and . out-of-state plates was occupied by three young, black male non-students. The lack of a criminal activity predicate for this investigatory stop is also underscored by Calhoun's testimony that, although she considered the behavior of Reid and Betemit/Torres to be suspicious generally, she did not suspect them of engaging in drug activity.

The Fourth Amendment requirement that a person must have committed, be committing, or be about to commit *unlawful acts* before an investigative stop is justified cannot, even under a lenient standard, be satisfied by a vague intuition that something was "not right" with the activities and presence on campus of these young, black men in an expensive, out-of-state car with tinted windows. Yet, that is all that formed the basis for this stop.

Nor can the stop be justified on the theory that the act of stopping temporarily in the fire lane of Ogden Hall constituted a traffic violation.[10] The theory fails at the threshold because the record shows that when informed that the vehicle should be moved, the occupants moved it, and no action was taken. Thus, the violation could not be the basis for an investigatory stop. McLaurin's statement that it was appropriate to order a stop of the vehicle to issue a warning against a future traffic violation after it left Ogden Hall and while it was en route to McGrew Tower was clearly pretext given that the driver already had been told to move the car and promptly had complied with the instruction. Nothing that happened thereafter warranted stopping the car. The testimony of Darby establishes that this was a concocted reason to effectuate a stop that was not otherwise warranted.[11]

The testimony offered to support the investigatory stop is a post-hoc rationalization based on a fundamental misapprehension of the Hampton University police respecting what *Terry* means. In fact, from shortly after the stop occurred, its legitimacy was questioned by the Chief of the Hampton University Police Department. On two occasions, one of which was the day of the evidentiary hearing in this case, the involved officers caucused to harmonize their recollections of events. Betemit/Torres argues, for these reasons, that the pedigree of the stop is doubtful and that the testimony of the officers involved in it should be disregarded. There is no need to resolve those issues, however, because, even after two caucuses, it is obvious that the officers involved in this stop misapprehend the reach of *Terry*. Their testimony establishes that they thought on February 9, 1995, and that they think now, that an investigatory stop is warranted on the basis of a reasonable belief that the occupants of the Mercedes were acting suspiciously.

---

**10.** Under *United States v. Hassan El*, 5 F.3d 726 (4th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 50 (1994), if the traffic offense, even a minor one, had been the reason for the investigatory stop, it would be valid even if the officer would have ignored the violation but for his intuitive suspicions that the occupants were engaged in some sort of criminal activity.

**11.** When Knight flashed his emergency lights, the Mercedes responded immediately by stopping. It so happened that the car pulled over into a fire lane in front of McGrew Tower. Remarkably, Knight issued a traffic ticket for obedience to his order. The United States wisely does not argue that this "traffic violation" supports the investigatory stop.

■ That, however, is not what *Terry* and its progeny, no matter how leniently interpreted, require. There must be a reasonably articulable suspicion that the objects of the investigatory stop are or have been engaged in, or are about to engage in, criminal activity. *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). Absent that critical predicate, generally suspicious behavior does not authorize even the limited intrusion on personal liberty sanctioned by *Terry*.

Every officer who testified focused on how reasonable it was for him or her to be suspicious of the occupants of the Mercedes. The only witness, however, to articulate the criminal activity predicate required to support a valid *Terry* stop was McLaurin when she said that she thought Reid was involved in drug activity because he used a cellular telephone and was nervous. This is an insufficient basis on which to support an investigatory stop of the Mercedes. Nor do the objective facts, whether known to McLaurin or not, suffice to support a reasonable suspicion that the occupants of the Mercedes were engaged in, had engaged in, or were about to engage in, criminal activity. In sum, the record shows that the investigatory stop here does not pass constitutional muster.

■ Because the initial stop of the vehicle was not justified, it follows that the subsequent searches of vehicle and its occupants were not lawful. But for the prior illegal detention, the evidence in the car and trunk would not have been discovered. As such, the fruits of the search are tainted and cannot be admitted into evidence at trial against the defendant. *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1939); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The fact that Betemit/Torres initially consented to the search does not remove the taint that accompanies the fact that consent was obtained through the exploitation of an illegal stop. The connection between the illegal

stop and the consent, both temporally and causally, was not sufficiently attenuated to vitiate the former's taint from the ultimate fruits of the search. *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Gooding*, 695 F.2d 78, 84 (4th Cir.1982).[12]

The United States suggests that the search of the vehicle is saved by the rules announced in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) and *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). *Chimel* involved the permissible scope of a search incident to a lawful arrest and hence is not applicable here. *Long* involved the scope of a search incident to an investigatory stop lawful under *Terry*. Since the stop here was not lawful under *Terry*, the decision in *Long* cannot validate the search of the Mercedes.

## CONCLUSION

Because the officers had no reasonably articulable suspicion of criminal activity, the investigative stop of the Mercedes was unlawful and the fruits of that search cannot be admitted into evidence at trial. The Defendant's Motion to Suppress is granted.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

■

12. Although it is not necessary to reach the issue because the initial stop was impermissible, it is beyond question on the facts that Betemit/Torres withdrew his consent before Knight found the .38 caliber pistol or the cash. Darby's testimony makes this clear and he also establishes that withdrawal of consent was communicated to McLaurin and Robinson. The court does not accept McLaurin's testimony that she did not receive this information or Robinson's testimony that he received notice of the withdrawal only after the search was finished.