**UNITED STATES of America,**

v.

**Shalaby SUNDIATA, a/k/a Rufus Batts, Defendant.**

**Criminal Action No. 2:98cr8.**

United States District Court,
E.D. Virginia,
Norfolk Division.

April 7, 1998.

Janet Sue Woehl Reincke, Office of U.S. Attorney, Norfolk, VA, for U.S.

William A. Lascara, Lascara & Associates, P.C., Norfolk, VA, for Shalaby Sundiata.

### MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

This matter is before the Court on Defendant Shalaby Sundiata's motion to suppress. Defendant was indicted January 21, 1998 for possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1), and for possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). These charges were brought after an investigatory stop of the Defendant, who is a convicted felon, resulted in the discovery of a weapon and ammunition in the Defendant's possession. Defendant now seeks to suppress all evidence gathered, including any statements made by the Defendant, incident to the stop, search, seizure and arrest that occurred on October 8, 1997. Both parties have briefed the issue, and on March 26, 1998, the Court held a hearing on the matter. The Court granted the motion to suppress and expressed its intent to issue a written decision.

Accordingly, this memorandum opinion and order explains and supplants the ruling from the bench.

## I. Factual background

The facts of the night in question, as developed for purposes of this motion by the testimony of Officers Fields and Warwick[1] are as follows:

On October 8, 1997, at approximately 1:15 a.m., Norfolk Police Officers A.J. Warwick, R.N. Fields, and O.N. Burruss went to the 100 block of Bellamy Ave. in Norfolk with the intention of serving a felony warrant upon a Mr. Tilmon Brown. The officers did not have the warrant in hand. Instead, they had obtained information pertaining to the outstanding warrant from the computer located in their car, and had verified the warrant by phone. The information the officers possessed regarding the subject of the warrant was limited to name, address, date of birth, gender, race, and social security number. The officers were not personally acquainted with Mr. Brown, nor did they have a detailed description of the suspect, and only knew they were looking for an elderly black male.[2]

When the three uniformed officers traveling in an unmarked car arrived at the address listed in the warrant, they found it to be a two story apartment building with approximately eight units. The police officers parked in the street in front of the building, slightly to the left. The officers entered the building and went to apartment G on the second floor, which had been identified as Mr. Brown's residence. Officer Warwick knocked on the door, but received no answer.

After failing to locate Mr. Brown, Officers Fields and Burruss returned downstairs, leaving Officer Warwick at the door of apartment G.

As he was leaving the building, Officer Fields testified that he observed a car, a blue Geo, parallel parking behind the police officers' vehicle.[3] Officer Fields testified during the March 26, 1998 hearing that although he could see a passenger in the car, he could only determine the passenger's race (African–American), and not whether the passenger was male or female. Officer Fields was not able to see the driver of the car. Officer Fields testified that the passenger appeared to look at the officers as they exited the building, and that the Geo then pulled out and drove away "quickly."[4] There was no testimony that the car was speeding, or that it violated any traffic ordinances.

Officers Fields and Burruss called up to Officer Warwick, who was still in front of apartment G. The three officers then followed the Geo in their own vehicle, with Officer Burruss driving, and pulled the Defendant's car over a short distance away. The officers did not run a check on the license plate of the Geo before pulling it over. The Geo was not driving in a erratic or unsafe manner, nor was it speeding. The Geo stopped almost simultaneously with the activation of the police car's lights, and made no attempt to flee or evade the police vehicle.[5]

Upon pulling over, the Defendant, who was driving the Geo, exited his vehicle and began walking towards the back of the car and the

---

1. Defendant subpoenaed Officer Burruss, but he failed to appear.

2. An arrest of the subject of this warrant subsequent to the events in question in this case revealed Mr. Brown to be a short, elderly black male with either grey hair or bald. The Defendant is a taller, middle aged black male with black hair.

3. Officer Warwick testified that he did not see the car pull up and drive away, as he was still in front of apartment G at the time. Therefore, all evidence offered by the government pertaining to the existence or nonexistence of reasonable suspicion must be based upon Officer Fields' testimony, as Officer Burruss did not testify, and Officer Warwick was not a witness to the obser-

vations of the Defendant's conduct before the stop.

4. As developed during the March 26, 1998 hearing, in prior testimony before the General District Court of the City of Norfolk, Criminal Division on December 5, 1997 (*see infra*), Officer Fields testified that he had seen "a black male and a black female in the passenger" when he observed the car, and that "both subjects appeared to look at us." *See* Motion to Suppress Evidence, Exhibit A, Pg. 14–15.

5. The Court finds, and neither party contests, that a "seizure" for purposes of the Fourth Amendment occurred when the police officers pulled the Defendant over.

sidewalk. Officer Warwick stopped the Defendant, and for safety reasons, Officer Fields executed a frisk for weapons. Officer Fields discovered a pistol magazine containing several rounds in the Defendant's left front pant pocket. A subsequent search of the Defendant's vehicle for the corresponding weapon produced a Bryco 9mm semi-automatic pistol under the Defendant's seat. Defendant was placed under arrest.

Defendant was initially brought on weapons charges before the Honorable Ray W. Dezern, General District Court of the City of Norfolk, Criminal Division. On December 5, 1997, after a preliminary hearing and testimony from Officer Fields regarding the circumstances of the stop and arrest, Judge Dezern summarily dismissed all - state charges.

On January 21, 1998, the Defendant was indicted by a Federal Grand Jury.

## II. Discussion

█ In reviewing the circumstances behind the stop, search, and subsequent arrest of the Defendant, the Court's concerns are focused chiefly upon the officers' initial stop of the Defendant. The officers' conduct after the stop was proper. Confronted by an unknown subject who had left his vehicle without instructions from the officers, and who could possibly flee, the officers were justified in conducting a limited frisk of the Defendant for safety purposes. After the discovery of the magazine, the officers were justified in conducting a limited search of the areas of the vehicle under the Defendant's control for the matching weapon. Therefore, if the initial stop itself is proper, the evidence seized during the search and the Defendant's statements are not tainted.

### A. Standard

█ The legality of the initial stop is governed by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. *Terry* established that the Fourth Amendment permits limited investigatory stops ("*Terry* stops") where there is some reasonable, articulable, and objective manifestation that the person seized is, or is about to. be, engaged in criminal activities.

*Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1990); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *Terry*, 392 U.S. at 16–19, 88 S.Ct. at 1877–79; *see also United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988). This requires that the officer's suspicion of criminal activity be based upon more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. The government must articulate a specific and objective basis for the officer's suspicion of criminal activity, so that the Court may assess the reasonableness of the suspicion and the stop independent of the officer's subjective assertions. *Cortez*, 449 U.S. at 417–418, 101 S.Ct. at 695; *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982). This assessment, however, is a practical determination, dealing not with "hard certainties, but with probabilities" in order to reach a "common sense conclusion" as to whether the articulable facts reasonably raise suspicion. *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695. The Court must keep in mind, however, that this suspicion, based upon the totality of the circumstances, must be a *particularized* suspicion. *Id.* That is, the specific and objective basis provided by the officers must raise the "suspicion that the *particular* individual being stopped is engaged in wrongdoing." *Id.* (emphasis added). "This demand for specificity in the information upon which police action is predicated is *the central teaching of [the Supreme Court's] Fourth Amendment jurisprudence.*" *Id.* (*citing Terry*, 392 U.S. at 21, n. 18, 88 S.Ct. at 1880, n. 18) (emphasis in original).

### B. The Government's Position

During argument, the government indicated that it relied upon three factors which, in its view, supported the reasonable suspicion of the officers that the Defendant was engaged in, or was about to be engaged in, criminal activity, thereby permitting an investigatory stop. The three factors were: 1) the lateness of the hour; 2) the fact that the officers were attempting to serve a felony

warrant; and 3) the fact that the automobile driven by the Defendant drove off at the sight of the officers. On scrutiny of these factors, the Court finds that they do not provide a reasonable articulable suspicion justifying the stop of the Defendant.

### 1. The lateness of the hour

██ The lateness of the hour may be a factor contributing to the totality of the circumstances, but it carries little independent weight. This is particularly true when there is no testimony that the actions the police observed (i.e. an automobile parking on a public street) were somehow unusual for the hour, or the area, or were of a type that, when performed at such an hour, would tend to suggest criminal activity.[6] The Court finds that, given the objective innocence of the conduct (parking and driving in public streets), and the lack of testimony as to inferences properly drawn from the time period, the lateness of the hour is properly given little objective probative value.

### 2. The felony warrant

██ The government's contention that the fact that the officers were attempting to serve a felony warrant supports the reasonable suspicion of the automobile they observed is a curious one. *Terry* makes no distinction in standards based upon the function the police were performing at the time of the stop. Whether police officers are attempting to serve a warrant, responding to a report or complaint, or on patrol, the requirement that they must possess reasonable suspicion that the specific individual being seized has, is, or is about to engage in criminal activity does not change. While probable cause may exist to issue a warrant for a specific person residing in a specific location, the fact that a warrant has been issued for someone does not give a police officer carte blanche to randomly stop people away from the address in' the warrant to ascertain if they are, indeed, the individual wanted on the warrant. Law enforcement officers are prohibited from "stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity." *Brown*, 443 U.S. at 52, 99 S.Ct. at 2641. The fact of the warrant, therefore, does not change the need for particularized suspicion.[7]

██ Obviously, had the officers been able to match the occupants of the car to the admittedly limited description provided on the warrant, this factor might contribute to the officer's suspicions.[8] In the instant case, however, Officer Fields testified on March 26 that he was unable to see the driver of the car, and could ascertain only the race of the passenger. The officers, therefore, could not match even the most rudimentary of identifying factors—the gender of the subjects in the automobile—to the individual sought in the warrant. As race is not a proper basis for an investigatory stop, *Brignoni–Ponce*, 422 U.S. at 885–87, 95 S.Ct. at 2582–83, and as the government has not argued, nor presented testimony that this factor contributed to the decision to stop the Defendant's car, the Court cannot find this contributed to a reasonable suspicion on the part of the officers. In fact, the lack of information suggesting a

---

**6.** For example, depending on the character of the area, the presence of a car may or may not be an unusual occurrence, and therefore may be more or less relevant to establishing reasonable suspicion. *See, e.g., United States v. Betemit*, 899 F.Supp. 255, 261 (E.D.Va.1995) ("it may be suspicious to see a stranger in a seldom-traveled rural area at 1 a.m., but not suspicious at all to see a strange car at 1 a.m. in a vacation community") (citations omitted). No testimony was offered as to whether or not it was a common occurrence to see vehicles in the area in question at 1:00 a.m. Nor was any testimony offered as to whether this was a high crime area, or if other circumstances existed that made the timing of the events in question particularly suspicious. *See also United States v. Wilson*, 953 F.2d 116,

124 (4th Cir.1991) ("special meanings" attributable to certain factors must be communicated to the court for the court to draw any inferences).

**7.** It is instructive to note that, contrary to the government's assertions during argument, had Mr. Brown actually been discovered in the Geo after the stop, reasonable suspicion to perform a *Terry* stop would still have been required.

**8.** Although given the very limited information provided—name, age, race, sex, residence, and social security number—matching the individuals in the car to the description in the warrant would not have sufficed alone, without additional factors suggesting reasonable suspicion.

connection between the individuals in the car and the individual described in the warrant reduces the justification for the stop, as police officers are prohibited from performing stops simply for identification purposes without a specific basis for believing the individual stopped is involved in criminal activity. *Brown*, 443 U.S. at 52, 99 S.Ct. at 2641.

During argument the government suggested that the warrant contributed to a reasonable suspicion of the Defendant because when the officers attempted to serve the warrant, there was no answer at the suspect's door. The government argues that when the officers exited the building and spotted the Geo, they could reasonably surmise the subject of the warrant was in the vehicle. This argument is based upon the tautological truth that if the suspect was not home, he must be somewhere else.[9] This offers no grounds, however, for the police officers to reasonably suspect that the suspect was in the first car they saw—as opposed to anywhere else in the world—particularly where, as discussed *supra*, the officers could not ascertain that either of the subjects in the car matched any part of the description furnished in the warrant, save race. Carried to its logical extreme, this argument would suggest that officers serving a warrant who fail to find the subject in the given address get a 'first stop free'—to stop the first person they come across because it *could* be the subject of the warrant. The Court cannot find that this possibility contributes more than marginally to the totality of the circumstances.

In its brief, the government's central argument was very similar to the point just discussed. In essence, the government argued that the proximity of the Defendant's car to the residence of the suspect sought pursuant to the warrant provided grounds for reasonable suspicion and a proper investigatory stop. In other words, because the Geo at-

tempted to park and then departed from the street in front of Mr. Brown's building, the government would argue the officers were justified in performing a limited stop to determine if the car contained Mr. Brown. For this proposition, the government solely relied upon *United States v. Decator,* 131 F.3d 137, 1997 WL 770609 (4th Cir.1997) (unpublished). *Decator,* however, is not a published case,[10] and therefore carries little precedential value. *Decator* can nevertheless be distinguished from the instant case. In *Decator,* officers investigating a bank robbery that had occurred earlier that day traced a vehicle used in the robbery to a particular residence. *Id.* at *1. The officers had the residence in question under surveillance when they observed a vehicle (not the vehicle used in the robbery) travel down the alley behind the residence under surveillance, and park in the private parking area of that residence. The vehicle departed with two black male occupants. *Id.* Although the officers were unable to ascertain any other information confirming that the occupants of the car matched the suspects being sought, (other than their race). *Id.* at *9, the court found reasonable suspicion supported a subsequent investigative stop specifically because the individuals in the vehicle were driving away from the home of the suspected bank robber. *Id.* at *4 ("the fact that the Camry was driving away from ... the home of the suspected bank robber, was a sufficient basis ... for the officer's suspicion.").

■ In the instant case, the police officers observed a vehicle parallel park, and then leave a parking space on a public street in front of an apartment building. This was not the private parking area of the residence of the subject of the warrant. This was not even a parking lot specifically for the apartment building in question. Unlike *Decator,* where the officers could arguably objectively connect the vehicle to the specific address

---

9. Which, of course, is not necessarily true—the suspect may have simply not answered the door. There was also no evidence presented as to whether the residents of the other apartments were home or away (and therefore returning), whether there were other people present in the area, or whether anyone else arrived or left from the building during the period in question. *See*

*Brown*, 443 U.S. at 51–52, 99 S.Ct. at 2641 (lack of evidence that presence of Defendant in alley was unusual supports finding of no reasonable suspicion).

10. A fact the government failed to note anywhere in its brief.

under surveillance, in the instant case there is no objective connection between the public street and the apartment listed in the warrant. Nor was there any objective connection between the occupants of the car and the building, much less the specific apartment. There was no testimony that an occupant of the car left the vehicle and entered the building, as one did in *Decator*, or that the car had been observed at the building in the past, or that the subject of the warrant was known to have or ride in a similar vehicle. Simply parking on a public street in front of a building that contains the residence of the subject of a warrant cannot create reasonable suspicion that the individual or individuals in the car are actually the subject of that warrant. *See, e.g., United States v. Green*, 111 F.3d 515, 519–520 (7th Cir.1997) *cert. denied* —— U.S. ——, 118 S.Ct. 427, 139 L.Ed.2d 328 ("[t]hat on one occasion a car is parked on the street in front of a house where a fugitive resides is insufficient to create reasonable suspicion that the car's occupants had or are about to engage in criminal activity").[11]

### 3. The departure of the car

■ The government's final specific and articulable fact offered to show reasonable suspicion that the occupants of the car were committing, or had committed a crime is the "quick" departure of the Geo from the parking space behind the unmarked police car. The government, relying upon language in *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir.1997) which states that "[e]vasive conduct can . . . assist an officer in forming reasonable suspicion," *Id., citing United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993), characterized the Geo's "quick" departure from the parking space upon sight of the police officers as evasive conduct which would justify an investigatory stop.[12] This fact is likewise insufficient specific and articulable basis for reasonable suspicion. As *Sprinkle* itself notes, evasive conduct may "assist" the police officer; it does not independently create a basis for that suspicion. In *Sprinkle*, despite arguably evasive conduct by one of the subjects in hiding his face when officers approached the car,[13] and driving off as soon as the officers passed, the Fourth Circuit found insufficient evidence to justify a *Terry* stop. *Sprinkle*, 106 F.3d at 618–619. In *Lender*, while finding sufficient evidence to justify a *Terry* stop, the Fourth Circuit did not solely rely upon the evasive conduct of the individual. In addition to evasive conduct, the officers had observed the subject in a known drug area late at night, engaged in actions that the officers testified their experience led them to believe were consistent with drug transactions. 985 F.2d at 154. Finally, while *Sprinkle* relies upon *Lender* for the "evasive conduct" principle, *Lender* relies upon *United States v. Sharpe*, 470 U.S. 675, 683 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). *Lender*, 985 F.2d at 154. In *Sharpe*, after noting that evasive conduct was one of five different objective facts supporting reasonable suspicion, notes "[p]erhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together . . . they provided clear justification to stop the vehicles." 470 U.S. at 682 n. 3, 105 S.Ct. at 1573 n. 3. Evasive conduct, therefore, may properly be considered in the totality of the circumstances, but is not, in and of itself, sufficient to create reasonable suspicion. *See, e.g. United States v. Davis*, 94 F.3d 1465, 1468–69 (10th Cir.1996) (defendant's making and breaking eye contact with officers, walking

---

**11.** Notably, the Seventh Circuit held in *Green* that no reasonable suspicion existed even considering the fact that the car took arguably evasive action while being followed by police officers. 111 F.3d at 520 n. 2.

**12.** The government interpreted the Geo's departure as suggesting that the individuals inside did not wish to be identified. However, as police officers are prohibited from stopping individuals simply to demand identification, *Brown*, 443 U.S. at 52, 99 S.Ct. at 2641, the stop of the Defendant cannot be justified solely on a police desire to identify the occupants of the car, or upon a belief that the occupants do not wish to interact with the police. *See infra* note 16. The government must point to specific, articulable facts that support a reasonable suspicion that the occupants of the car were actually the subject of the warrant, or to put it another way, had committed, were committing, or were about to commit a crime.

**13.** An action found informative in other cases, *see, e.g. United States v. Tate*, 648 F.2d 939 (4th Cir.1981).

away from officers, and then refusing to stop when ordered to do so does not furnish basis for valid *Terry* stop); *Green*, 111 F.3d at 519–520 n. 2 (while being followed by officers, defendants doubled back and made abrupt turns—even when combined with sighting of car in front of fugitive's house, insufficient to justify *Terry* stop).

Nor is it clear that the conduct in the instant case should properly be characterized as "evasive conduct." The government presented no evidence of evasive conduct, save that the passenger in the car looked at the officers and that the car left "quickly." The adjective "quickly" is subjective; there was no evidence presented that the car was speeding, that it was operated in an unsafe manner, that it violated any traffic ordinances. *Compare Sprinkle*, 106 F.3d at 616 ("[h]e drove in a normal, unsuspicious fashion; he did not speed, drive erratically, or commit any traffic violations"). There was no testimony to elaborate upon the meaning of "quickly;" no testimony as to the rate of speed it left the parking space, no testimony as to squealing tires, or any other indicia of speed. There was no testimony that once the officers pulled behind the Geo that it operated in anything but a normal fashion. Without any testimony that the Geo was speeding or otherwise acting in an evasive manner, *see Sharpe*, 470 U.S. at 683 n. 3, 105 S.Ct. at 1574 n. 3, all the Court is left with is the testimony of Officer Fields that the Geo left it's parking space "quickly," which is insufficient. *See United States v. Peters*, 10 F.3d 1517, 1521 (10th Cir.1993) (a lane change characterized as "abrupt" while being followed by officer not enough to create reasonable suspicion).

## C. Analysis

The Court believes that the issue before it is governed by *Sprinkle*, which is a published decision of the Fourth Circuit, and is therefore binding precedent upon this Court.[14] In *Sprinkle*, a officers stopped a vehicle that contained two individuals because 1) the vehicle was parked in a high drug crime area, 2) the vehicle contained an individual known to have participated in narcotics violations in the past, 3) the officers observed the occupants of the vehicle act in a manner the policeman interpreted to be consistent with drug transactions, 4) upon sighting the officers, one individual in the car had attempted to evade identification, and 5) given the circumstances, the officers believed the driver of the vehicle was attempting to avoid scrutiny by driving away. 106 F.3d at 617. Despite the presence of these specific, articulable, and particularized facts, the Fourth Circuit found that reasonable suspicion sufficient to justify a *Terry* stop did not exist. *Id.* at 618–619. Taken in totality, there seems little question that there was greater objective, particularized basis for suspicion in *Sprinkle* than in the instant case, where an unidentified vehicle is observed leaving a street parking spot "quickly" upon the sight of police officers.[15] Even consider-

---

14. The government seeks to distinguish *Sprinkle* by arguing that the police officers in *Sprinkle* "knew the defendant was not the person they were originally seeking," and that there was no evasive conduct in *Sprinkle* because the suspects "did not drive off at the sight of the officer's uniforms." Government's Response to Defendant's Motion to Suppress Evidence, at 6 n. 3. This is not, however, an entirely accurate relation of the facts of *Sprinkle*. In *Sprinkle*, the officers were not seeking anyone at all; they had just finished returning a misbehaving juvenile to his house. 106 F.3d at 615. Unlike the instant case, the officers in *Sprinkle* knew that at least one of the occupants of the car had a prior criminal history of narcotics violations, which was consistent with the suspicious activities they observed in the car. *Id.* at 615–616. In the instant case, the officers possessed no knowledge whether the individuals in the car matched even the rudimentary description given in the war-

rant. *See supra*. Secondly, while the suspects in *Sprinkle* did not drive away at the first sight of the officers, one suspect did attempt to hide his identity upon sight of the officers, and the suspects drove off shortly after observing the officers. *Id.* at 616. As discussed *supra*, the act of hiding one's face can be characterized as "evasive conduct," and the government argued in *Sprinkle* that these actions were indeed suspicious. *Id.* at 617. The Court finds that *Sprinkle* is not materially distinguishable from the instant case.

15. The sole notable difference between *Sprinkle* and the instant case is that the *Sprinkle* court found that the car in question had been operated in a normal, unsuspicious fashion. 106 F.3d at 616. *Sprinkle*, however, defined a normal, unsuspicious fashion as being one that did not involve speeding, driving erratically, or commit-

ing the additional factors of the lateness of the hour, and the proximity of the residence of a fugitive, collectively, these factors do not amount to a reasonable, articulable suspicion that any criminal activity was, had been, or was about to be, undertaken.[16] The government has failed to meet its burden to offer evidence supporting a finding of reasonable suspicion.[17] The Court cannot find that a *Terry* stop was justified upon the subjective opinion of one officer present at the scene that a car left a parking spot "quickly." *See Brown*, 443 U.S. at 51–52, 99 S.Ct. at 2641 (despite officer's subjective assessment that defendant looked "suspicious" and was present in high crime area, reasonable suspicion for *Terry* stop lacking, particularly in light of lack of further evidence). As in *Sprinkle*, the departure of the Geo and the other factors might raise the "curiosity" of the police officers. *Id.* They are not, however, enough to justify a *Terry* stop. "[T]here must be (other) particularized evidence that indicates criminal activity is afoot." *Id.* " '[R]easonable suspicion' does not equate with 'some' suspicion of wrongdoing." *Wilson*, 953 F.2d at 127; *see also United States v. Betemit*, 899 F.Supp. 255, 263 (E.D.Va.1995) ("generally suspicious behavior does not authorize even the limited intrusion on personal liberty sanctioned by *Terry*").

The Court finds that Officers Fields, Warwick, and Burruss did not objectively possess reasonable, articulable suspicion that the particular individuals in the Geo had committed, were committing, or were about to commit a crime when they stopped the Defendant's car on October 8, 1997. To find otherwise is to rely solely upon the subjective assertions of the police officers, and thereby abdicate the Court's responsibility to be "ultimate enforcers of the principle" that a stop must be based upon a reasonable and articulable suspicion, and to lose the "precious right—hard earned and easily lost—to be free of arbitrary police intrusions on individual privacy and free movement." *United States v. Gooding*, 695 F.2d 78, 82, 84 (4th Cir.1982).

### III. Conclusion

Because the initial stop was improper, the subsequent frisk of the Defendant and search of his car was not lawful. The fruits of this search are therefore tainted and cannot be introduced at trial against the Defendant. As the search was not justified, the subsequent statements made by the Defendant are also tainted and are not admissible against the Defendant at trial. *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

For the foregoing reasons, the Court **GRANTS** Defendant's motion to suppress evidence.

The Clerk of Court is **DIRECTED** to send a copy of this Order to counsel of record for Defendant, and to the United States Attorney.

It is so **ORDERED**.

---

ting traffic violations. *Id.* Save for the description of the Geo's departure as "quick," the operation of the vehicle in question in the instant case similarly did not involve speeding, driving erratically, or committing traffic violations.

**16.** Taken collectively, these facts suggest not a particularized and reasonable suspicion that one of the individuals in the Geo was in fact the subject of the warrant, but rather that the individuals in the Geo did not wish to interact with the police. As there is no affirmative duty on the part of an individual who is approached by a police officer to answer questions, and a refusal to answer or even listen to questions does not, without more, furnish grounds for seizing that individual, *Florida v. Royer*, 460 U.S. 491, 497–

98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion), a desire to avoid interacting with police officers, without more, cannot support a finding of reasonable suspicion. *See also Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) (the Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure").

**17.** The government's suggestion that the lack of evidence of an innocent reason for the Defendant driving away supports their position is erroneous. The government has the burden of demonstrating reasonable suspicion.