STATE of Missouri, Plaintiff–
Respondent,

v.

Jeffrey A. SCHMUTZ, Defendant–
Appellant.

No. 24742.

Missouri Court of Appeals,
Southern District,
Division Two.

March 31, 2003.

Amy M. Bartholow, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Joel A. Block, Office of Attorney General, for respondent.

KENNETH W. SHRUM, Judge.

Jeffrey A. Schmutz ("Defendant") appeals his conviction for driving while intoxicated in violation of § 577.010, RSMo

(2000).[1] Defendant alleges the trial court committed reversible error when it overruled his motion to suppress and admitted the evidence at trial over Defendant's objections. Defendant claims such evidence should have been excluded at trial because the police officer had no reasonable suspicion to stop Defendant's vehicle. We agree. We reverse.

Because Defendant filed a motion to suppress and properly objected to the admission of the evidence at trial, the appellate court examines the record made at the suppression hearing as well as the trial record. *State v. Deck*, 994 S.W.2d 527, 534[9] (Mo.banc 1999); *State v. Weddle*, 18 S.W.3d 389, 391[2] (Mo.App.2000). In our review, we view the facts in the light most favorable to the trial court's ruling. *Id.* We also defer to the trial court's factual findings and credibility determinations and review only to determine if such are clearly erroneous. *Id.* at 391–92[3]. Whether the historical facts as found by the trial court add up to reasonable suspicion is a question of law that we review *de novo*. *Id.* at 392[4].

In large measure, the facts of this case are not in dispute. On February 23, 2001, officer David Fajen ("Fajen") of the Warsaw, Missouri, police department was on patrol around 12:30 a.m. when he witnessed a white, Chevrolet pickup truck pull into the Eastgate Shopping Center. The truck pulled into the east side of the center, "then turned around and backed" into a parking space by the building, and the lights were turned off. Fajen began "watching the truck to see if there was any crime occurring or about to occur." None of the businesses in the shopping center were open at this time of night, but the front of the center was well illuminated.

The illumination of the east side of the center (where the truck was parked) was described by Fajen as "[y]ou can see visible. It's not dark but it's not, you know, it's not—I couldn't read under it I don't think." All of the entrances into the center were located at either the back or the front.

Fajen testified at trial that he watched the vehicle for approximately "two or three minutes," but at the suppression hearing he claimed he only watched it for "15, 20 seconds." No one exited the truck. Fajen claimed, "if there was going to be a crime I didn't know if they'd see me there. So I wanted to kind of get in a less-conspicuous location." Fajen changed his position which took "[p]robably 15 to 20 seconds."

From his new location, Fajen could see one person sitting in the driver's seat of the truck. Fajen continued his surveillance for approximately five minutes. From the time the truck parked by the building until it exited the lot, Fajen saw no one exit the truck, nor did the vehicle move. At this point, "the truck turned its lights on and left the parking lot in a little bit of a hurry." The truck was not speeding or violating any traffic laws. Fajen admitted that the truck did nothing "unusual" at this time, but claimed the speed "was just a little, I don't know, excessive, maybe."

Fajen followed the truck and pulled it over as it turned onto an exit ramp for the highway. Fajen stated his sole reason for the stop was as follows: "I wanted to identify him, find out what he was doing in the parking lot at that hour, and at least to get a name in case a crime had been committed."[2] Fajen approached the truck and asked for the driver's license and proof of insurance. Fajen also asked the

---

1. All statutory references are to RSMo (2000), unless otherwise indicated.

2. Fajen received no information that a crime had been committed at the shopping center.

driver what he was doing in the parking lot, and Defendant responded that he was waiting for his girlfriend. At this point, Fajen "could detect an odor of intoxicants coming from inside" the truck and asked Defendant to submit to a portable breathalyzer test as well as field sobriety tests. Defendant was later placed under arrest for driving while intoxicated.

Defendant alleged Fajen lacked reasonable suspicion to conduct a *Terry* stop of his vehicle on the ramp.[3] As such, prior to trial, Defendant sought to suppress all "statements and evidence" collected as a result of the traffic stop pursuant to the fruits of the poisonous tree doctrine. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Pfleiderer,* 8 S.W.3d 249 (Mo.App.1999). The trial court overruled the motion to suppress and allowed the statements and evidence collected as a result of the traffic stop to be admitted at trial. The jury found Defendant guilty of driving while intoxicated, and he was sentenced to two years' imprisonment in the Department of Corrections. This appeal followed which raises one issue, "Did officer Fajen have reasonable suspicion to make a *Terry* stop of Defendant's vehicle?" We answer this question in the negative.

The Fourth Amendment to the United States Constitution preserves the right of citizens to be free from unreasonable searches and seizures. *Deck,* 994 S.W.2d at 534. This constitutional guarantee is co-extensive with Missouri's search and seizure guarantee in Article I, Section 15. *Id.* Generally, a warrant based upon probable cause is required to justify a search and seizure. *Id.* Specific and well-delineated exceptions do exist to the warrant requirement, however, and the state

has the burden to prove that a warrantless search or seizure falls within an exception. *State v. Martin,* 79 S.W.3d 912, 916[8] (Mo.App.2002).

One such recognized exception is the aforementioned *Terry* stop. *Id.* at 916[9]. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. In determining whether an officer acted reasonably in a given situation, due weight must be given to specific, reasonable inferences which he or she is entitled to draw from the facts in light of his or her experience, but not to inchoate and unparticularized suspicion or "hunch." *Id.,* 392 U.S. at 27, 88 S.Ct. at 1883. The police officer's observations of unusual conduct must lead him or her to reasonably conclude that criminal activity is afoot. *Id.,* 392 U.S. at 30, 88 S.Ct. at 1884.

The conclusion of whether the facts and reasonable inferences amount to reasonable suspicion is to be determined by reference to the totality of the circumstances. *Deck,* 994 S.W.2d at 534[10]. The principles enunciated in *Terry* apply to traffic stops. *State v. West,* 58 S.W.3d 563, 568[11] (Mo.App.2001). The State does not dispute that Fajen seized Defendant within the meaning of the Fourth Amendment when he pulled Defendant's truck over on the exit ramp. Likewise, the State does not dispute that Fajen was required to have reasonable suspicion that criminal activity was afoot when he did so. The State does argue that Fajen possessed reasonable suspicion before he made the stop. We disagree.

---

**3.** The term *"Terry* stop" originates from the U.S. Supreme Court's decision in *Terry v.* *Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

No exact formula exists to define what constitutes reasonable suspicion. Each case must be analyzed on its own facts. Even so, the Supreme Court in *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), sheds considerable light on the limits of "reasonableness." In *Brown,* the police witnessed two individuals standing a few feet apart in an alley, but when their patrol car arrived, the two men began walking away from one another. The area was known to be a "high drug problem area." *Id.,* 443 U.S. at 48–49, 99 S.Ct. at 2639. The officers had never seen the defendant before, and they sought identification which was refused. Defendant was convicted under a Texas statute requiring an individual to provide identification.

The Court found that the police officer's testimony that the activity "looked suspicious" was insufficient because he could point to no facts supporting that conclusion. *Id.,* 443 U.S. at 52, 99 S.Ct. at 2641. This situation may have been different *if* the officer were "a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Id.* at n. 2, 99 S.Ct. 2637. The *Brown* court reasoned that the innocent activity coupled with the presence in a high drug area was insufficient. This case has facts similar to those in *Brown.*

Fajen testified he was "suspicious" because the vehicle drove onto the lot and parked at 12:30 a.m., but acknowledged he did not "see the truck violate any traffic laws or do anything unusual at that time." Although all business establishments in the area were closed, the truck was parked on the east side of the building where no entrances were located. Defendant remained in the truck and did nothing to arouse Fajen's suspicion. The lot was well-illuminated and in full view of north-bound traffic on Main Street. There was no evidence that this was a high-crime area, or a location of suspected drug trafficking, or that the area businesses were frequently burglarized. Apparently, Fajen did not observe activity that led him to believe Defendant or any other person was "casing" the stores for a future robbery, as occurred in *Terry.* We say "apparently," because Fajen did not articulate that as a reason for stopping Defendant. Fajen testified that as the truck left the parking lot, it did so in a "hurry," but not in a manner that violated traffic laws or ordinances.

As occurred in *Brown,* the record here shows innocent activity coupled with one "suspicious" factor. In *Brown,* the factor was the presence of individuals in a high crime area, whereas here, the factor was presence in an area where businesses were closed. In so stating, we note that the time of day is only a marginal consideration in the reasonable suspicion analysis. *U.S. v. Cortez,* 449 U.S. 411, 420–21, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Evidence that Defendant left the parking lot in a "hurry" is likewise minimally relevant. *See e.g., United States v. Green,* 111 F.3d 515 (7th Cir.1997) (doubling back and abrupt turns insufficient to justify *Terry* stop); *United States v. Peters,* 10 F.3d 1517 (10th Cir.1993) (abrupt lane changes not enough to create reasonable suspicion); *United States v. Sundiata,* 3 F.Supp.2d 682 (E.D.Va.1998) (car leaving "quickly" is subjective and wholly insufficient to satisfy reasonable suspicion).

In sum, Fajen wholly failed to point to any specific and articulable facts giving rise to reasonable suspicion. He conceded he found nothing "suspicious about [the truck] being parked there at that time of night[ ]" and his sole reason for stopping Defendant was "to get a name in case" a crime had been committed. We can only conclude that Fajen was acting upon the type of inarticulate "hunch" that the *Terry*

court specifically rejected as a basis for reasonable suspicion. 392 U.S. at 21–22, 88 S.Ct. at 1880.

Support for this conclusion is found in cases from other jurisdictions with analogous facts.[4] In *Klare v. State*, 76 S.W.3d 68 (Tex.App.2002), a police officer saw defendant's white pickup truck parked behind a closed shopping center at approximately 2:30 a.m. The officer lost sight of the vehicle for "15 to 20 seconds," during which time the truck left the lot. *Id.* at 71. As the officer then came upon the previously parked vehicle, he pulled it over. There was a history of burglaries of the shopping center businesses, and the officer claimed it was "unusual" for a vehicle to be parked in that location at that time of day. *Id.* The officer stated he "wanted to I.D. the occupant." *Id.* Although the policeman in *Klare* provided more articulable facts giving rise to reasonable suspicion than did Fajen, the Texas court ruled these facts did not constitute reasonable suspicion. *Id.* at 77.

In *State v. Larson*, 93 Wash.2d 638, 611 P.2d 771 (1980), the police stopped a car to seek identification of the passengers of the vehicle. The car was parked in a "high crime area near a closed park late at night and [ ] it started to pull away as the police car approached." *Id.* at 774. Nothing indicated the passengers acted in a suspicious manner. The police could not point to any specific, individualized misconduct. On these facts (which are analogous to those found in this case), the *Larson* court held that the officers lacked reasonable suspicion.

In *State v. Epperson*, 237 Kan. 707, 703 P.2d 761 (1985), the police were on routine patrol in a neighborhood where many burglaries occurred. The officer saw a black BMW with two men inside, one of whom bent forward and then straightened at the sight of the police car. Both left the car and began walking down the street. The officer then seized the men and searched the car. The *Epperson* court found no reasonable suspicion existed. *Id.* at 767. Again, this is a case with analogous facts supportive of our holding.

Based upon the foregoing, we hold that Fajen lacked reasonable suspicion to conduct a *Terry* stop of Defendant. Fajen had a "hunch" that clearly did not justify the *Terry* stop. As such, all evidence obtained in violation thereof must be excluded; consequently, the trial court erred in overruling the motion to suppress and admitting the evidence at trial. *Martin*, 79 S.W.3d at 917; *Weddle*, 18 S.W.3d at 396.

The judgment of conviction and sentence is hereby reversed, and Defendant is ordered discharged from any incarceration related to this charge.

PREWITT, P.J., and RAHMEYER, C.J., concur.

---

4. Although cases from other states are not binding on this court, they are persuasive when they make a Fourth Amendment analysis consistent with federal precedents that Missouri courts follow. *See State v. Werner*, 9 S.W.3d 590, 595[5] (Mo.banc 2000).